UNITED STATES of America

v.

**Federico GIOVANELLI, a/k/a "Fritzy," Steven Maltese and Carmine Gualtiere, a/k/a "Buddy," Defendants.**

**No. S 88 Cr. 954 (CBM).**

United States District Court, S.D. New York.

July 10, 1989.

Benito Romano, U.S. Atty., S.D.N.Y., New York City by Adam S. Hoffinger and J. Gilmore Childers, Asst. U.S. Attys., for the U.S.

Lawrence Hochheiser, Hochheiser & Aronson, New York City by Vivian Shevitz and Georgia J. Hinde, for defendant Federico Giovanelli.

Ira S. Cooper, Zerin & Cooper, New York City by Ira S. Cooper and Neil Rothfeld, for defendant Steven Maltese.

Robert M. Baum, Legal Aid Soc., Federal Defenders Services Unit, New York City by Roland Thau and Robert E. Precht, for defendant Carmine Gualtiere.

## OPINION

MOTLEY, District Judge.

On June 29, 1989, the Government rested its case and defendants moved for a judgment of acquittal on all counts pursuant to Fed.R.Crim.P. 29(a). After hearing the arguments of counsel on June 30, 1989, the court granted the motion of defendants Giovanelli and Maltese for a judgment of acquittal on Racketeering Act 1b and Count 5, charging interstate transmission of wagering information in violation of 18 U.S.C. § 1084. The court also granted the

motion of defendant Giovanelli for a judgment of acquittal on Racketeering Act 5 and Count 6, charging interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952. As to the remaining counts and racketeering acts charged in the indictment, defendants' motions for a judgment of acquittal were denied.

This opinion sets out the court's reasons for the rulings summarized above. It also sets out the court's finding—pursuant to *United States v. Geaney*, 417 F.2d 1116 (2d Cir.1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970)—with respect to the use of co-conspirator statements as evidence against each defendant.

## DISCUSSION

In order to resist a defendant's motion for a judgment of acquittal on a particular count charged in an indictment, the Government must introduce sufficient evidence in its direct case "upon which a reasonable mind might conclude guilt beyond a reasonable doubt" as to that charge. *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984).

 In order to allow co-conspirator statements to be used as proof against a particular defendant pursuant to Fed.R. Evid. 801(d)(2)(E), the Government must show, by a preponderance of the evidence, that the defendant knowingly and wilfully became a member of and participated in the conspiracy charged in the indictment. *Geaney, supra*. This proof must consist of evidence independent of co-conspirator statements which could themselves be admissible against the defendant under the co-conspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). However, hearsay statements admissible against a defendant under some exception other than the one provided by Fed.R.Evid. 801(d)(2)(E) may be used by a court in its preliminary determination that the defendant knowingly joined in the conspiracy charged. *United States v. DeJesus*, 806 F.2d 31 (2d Cir.1986), *cert. denied*, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155 (1987) (in a *Geaney* finding court need exclude hearsay only admissible as co-conspirator statements under Fed.R.Evid. 801(d)(2)(E)).

Moreover, the hearsay statements of co-conspirators that would be admissible against a defendant under Fed.R.Evid. 801(d)(2)(E) may also be used to show that defendant's participation in a conspiracy provided that the hearsay statements are sufficiently reliable in light of independent corroborating evidence. *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir.1988), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (citing *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

On the basis of the evidence outlined below—and with the exceptions noted at the beginning of this opinion—the court finds that the Government has introduced sufficient proof upon which a jury could reasonably find each defendant's guilt beyond a reasonable doubt as to each count charged in the indictment. These same facts are also sufficient to show that defendants Giovanelli, Maltese, and Gualtiere unlawfully, knowingly and wilfully participated in the RICO conspiracy charged in Count One of the indictment and the conspiracy to defraud the United States charged in Count Seven. Finally, the evidence recited below is sufficient to show that defendants Giovanelli and Maltese unlawfully, knowingly and wilfully participated in the loansharking conspiracy charged in Racketeering Act 2 and Count 4 of the indictment.

When, as frequently occurs, the indictment charges an offense as both a racketeering act and a substantive count, the court will discuss each together. We now turn to a review of the evidence supporting each charge alleged in the indictment.

## I. COUNT I—RICO CONSPIRACY

 Count One charges all defendants with violation of 18 U.S.C. § 1962(d), that is, with RICO conspiracy, specifically conspiracy to violate 18 U.S.C. § 1962(c) by committing the crimes charged in the indictment.

The evidence for an agreement on the defendants' part to violate § 1962(c) is the evidence that they committed at least two of the racketeering acts with which they

are charged. As the court finds below, the Government has introduced sufficient proof upon which a jury could reasonably find each defendant's guilt beyond a reasonable doubt as to each count charged in the indictment. In view of that finding—that defendants committed at least two of the racketeering acts with which they are charged—there is evidence sufficient to show that the defendants agreed to commit at least two of such racketeering acts through a pattern of racketeering activity. The evidence discussed below with respect to Count 2 that defendants actually committed the racketeering acts charged in the indictment is also sufficient to find that the defendants agreed to engage in a pattern of racketeering activity through these acts.

## II. COUNT II—RICO

Count 2 of the indictment charges each defendant with conducting and participating in the affairs of a racketeering enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The essential elements of this crime are (1) that an enterprise as alleged in the indictment existed; (2) that the enterprise affected interstate or foreign commerce; (3) that the defendant was associated with or employed by the enterprise; (4) that the defendant unlawfully, willfully, and knowingly engaged in a pattern of racketeering by committing, or aiding and abetting the commission of, at least two acts of racketeering; and (5) that the defendant conducted or participated in the conduct of the enterprise's affairs through that pattern of racketeering activity.

a. Existence of the Enterprise/Effect on Interstate Commerce

■ The court observes that two elements of a RICO offense apply generally to each defendant: the existence of the enterprise as defined by the RICO statute, 18 U.S.C. § 1961(4), and the effect of that enteprise on interstate or foreign commerce.

The RICO statute defines an "enterprise" as, among other things, "a group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4). Proof as to the existence of the enterprise charged in the indictment would include facts showing defendants to be part of a formal and ongoing criminal organization, managed by them and functioning as a continuing unit. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). It would also include evidence that the business of the enterprise was racketeering activity, including gambling, loansharking, and murder.

The indictment charges that defendants were part of a racketeering enterprise whose participants included members and associates of the Genovese Crime Family. The purpose of the enterprise was to generate revenue for its members and for members of the Genovese family. In pursuit of that goal, the indictment charges that the defendants engaged in various illegal activities including the conduct of an extensive gambling operation and the extortionate extensions of credit. In addition, the indictment alleges that the defendants committed various acts of violence and murder to protect and further the illegal activities of the enterprise.

Vincent "Fish" Cafaro, a former "made member" of the Genovese Crime Family, testified that defendant Giovanelli was also a "made member" of that criminal organization. As such, Cafaro testified that whatever criminal activities Giovanelli engaged in would be protected and furthered by the power and resources of the Genovese Crime Family. In return, Giovanelli would generate revenue for the "higher-ups" in the family. Cafaro identified Vincent "Chin" Gigante as the current "boss" of the Genovese Family, with headquarters located in the Triangle Social Club at 208 Sullivan Street in Manhatten. Surveillance of the Triangle Social Club conducted by agents of the Joint Organized Crime Task Force produced numerous sightings of Giovanelli meeting with persons whom Cafaro identified as other "made members" of the Genovese Family. In addition, the Government produced several wiretap recordings—intercepted from Giovanelli's home phone—of calls between Giovanelli and those alleged members of the Ge-

novese crime group. The surveillance reports and wiretap recordings would support the conclusion that Giovanelli reported to Dominick "Baldy Dom" Canterino, whom Cafaro identified as a "capo" in the Genovese Family.

As to the existence of the specific enterprise charged in the indictment, Keeran "Butchy" Sullivan, who stated that he had known and worked for defendants for many years, testified that Giovanelli, Maltese, and Gualtiere were associates in an illegal gambling business headquartered at 41 Highland Place in the Ridgewood section of Queens. According to Sullivan, Giovanelli was the "boss" and "banker" of the operation, Maltese his "underboss," and Gualtiere the main accountant and controller. Sullivan testified that the enterprise took bets on "numbers," "horses," and "sports," functioned continuously for many years, and employed dozens, if not hundreds of people in its operations. His testimony is corroborated by numerous police officers and F.B.I. agents who observed frequent meetings between defendants and their alleged associates—in various combinations—at known and suspected gambling locations. In addition, the Government introduced numerous wiretap recordings on which defendants can be heard planning various meetings with each other and discussing what a jury could reasonably conclude were diverse aspects of their gambling business. Moreover, a police raid at 41 Highland Place—in which defendant Gualtiere was arrested—netted several boxes of gambling records introduced into evidence by the Government. Finally, FBI agents seized over $400,000.00 in cash from safe deposit boxes Giovanelli maintained in a bank in Middle Village, Queens.

In addition to the gambling business, Sullivan testified that he collected extortionate ("shylock") loans on behalf of defendant Maltese. Witness Richard "Bud" Waters testified that he made shylock loan payments to both Maltese and Giovanelli, as did witness Raymond Losito. Such testimony is additional evidence that Maltese and Giovanelli were associates in a criminal enterprise whose activities included extortionate loans.

Finally, proof that all three defendants were associated, in fact, in a racketeering enterprise can be derived from the testimony of witnesses showing all three men to be participants in the shootings of Detective Anthony Venditti and Detective Kathleen Burke. Moreover, evidence provided by Sullivan, John "Limpy" Cataraso, Detective Frank Cammaratta, and Detective Kathleen Burke show that the motive for the shootings was an attempt to preserve and protect the enterprise from a mistaken fear of robbery by the two detectives. Thus, there is proof to suggest that the defendants resorted to acts of violence and murder to defend their illegal activities. Testimony concerning the murder of Charles Bentivegna also suggests that it was carried out by defendants Giovanelli and Maltese to prevent Bentivegna from exposing the illegal activities of the enterprise to the police.

As to the effect of the enterprise's activities on interstate commerce, Sullivan testified that he personally took sports and numbers bets over the phone from callers in Chicago, Palm Springs, Florida, and New Jersey. Other evidence shows that Maltese transported a gun from Florida to New York that was eventually found near the scene of the Burke/Venditti shootings. The remaining elements of a RICO offense—association with or employment by the enterprise, unlawful, knowing and wilful commission of a pattern of racketeering activity and participation in the conduct of the enterprise's affairs through that pattern of racketeering activity—requires specific application to each defendant.

b. Association with the Enterprise

The evidence recited above concerning the existence of the enterprise and defendants' role in it is likewise sufficient to show that each of the defendants was aware of the existence of the criminal enterprise, was associated with and employed by the enterprise, and knowingly and intentionally participated in the enterprise's illegal activities.

c. Pattern of Racketeering Activity

The fourth element of a RICO offense is that a defendant unlawfully, wilfully, and knowingly engaged in a pattern of racketeering activity by committing or aiding and abetting the commission of at least two acts of racketeering related by common participants, victims, methods, goals, or motives and demonstrating a threat of continued racketeering activity. *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989) (en banc); *H.J. Inc. v. Northwestern Bell Tel. Co.,* — U.S. —, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). We now turn to each racketeering act charged in the indictment.

1. *Racketeering Act 1a/Count 3: Conduct of an Illegal Gambling Business*

██ The indictment charges the defendants with violating 18 U.S.C. § 1955. They are alleged to have conducted "an illegal gambling business" including bookmaking, policy, and a sports betting scheme which violated the laws of the state of New York, and in which five or more persons knowingly and intentionally "conduct[ed], finance[d], manage[d], supervise[d], direct[ed], or own[ed] all or part of such business" which "has been or remains in substantially continuous operation for a period in excess of 30 days," or, alternatively, that the gambling business had "a gross revenue of $2,000 in any single day."

Keeran Sullivan testified that he worked for the enterprise and was involved in the gambling operation of the enterprise with the defendants from 1970 until 1986. Sullivan met Maltese in 1970, Giovanelli in 1972 or 1973, and Gualtiere in 1974–1975. According to Sullivan, Giovanelli was the "boss" of the gambling operation and the "banker" who financed the operation. Maltese was Giovanelli's "underboss," gave out orders Giovanelli gave to him, and was in charge of supervising the operation. Gualtiere was the accountant and head controller of the operation and was in charge of all the "work" or gambling orders turned in to him at the end of the day.

Sullivan's testimony demonstrates that five or more persons agreed to conduct, finance, manage, or supervise all or part of the gambling business. Besides the defendants, a great deal of testimony showed that there were numerous others—"runners," "pick-up men," "sheetwriters"—who worked for the operation, which consisted of the gambling activities of bookmaking, policy, and sports bets. Moreover, surveillance photos and testimony from detectives and F.B.I. agents—showing numerous others in addition to the defendants (for example, Salvatore Arezzi, Peter Giganti, and Joe Rizzo) regularly entering and leaving the enterprise's alleged gambling spots—also show that more than five people conducted defendants' gambling operation. In addition, tape-recorded conversations involving the defendants in which they discussed, among themselves and with others associated with the gambling business, various aspects of the gambling operation—including discussions about the computation of revenues generated by the operation's daily illegal activities, and discussions about the daily winning numbers—shows that this element of the gambling charge has been sufficiently sustained by the Government.

The evidence presented through Sullivan as to the length of his association with the enterprise and the duration of the enterprise's existence also shows that the gambling business was in operation for a period of 30 days or more. Testimony by Detective John Holder shows that the gambling work seized during the raid of 41 Highland Place represented perhaps six months worth of work. Moreover, Barbara Messina Kranz, a regular bettor or customer of the gambling business, testified that she began placing bets seven or eight years ago with defendants' gambling business, and that she had placed those bets every day for herself and her family.

In the alternative, such evidence discussed above also shows that the gambling business, in any single day, had a gross revenue of at least $2000.00. For instance, Sullivan testified that he often took bets totalling $2000.00–$2500.00 on one day in the numbers or policy aspect of the business alone. He also testified that, on a

daily basis, the bookmaking part of the gambling operation brought in thousands a day. In addition, Sullivan testified that the sports aspect of the gambling business brought in $2000.00–$3000.00 a day, and up to $100,000.00 on a busy sports weekend. The statutory minimum requirement of $2000.00 gross revenue per day is also corroborated by Brian Aryai, an I.R.S. Special Agent, who reviewed and tabulated total revenues revealed in the gambling records seized during the January 14, 1982, raid of 41 Highland Place.

*New York Penal Law § 225.10, Subdivision 1, Promoting Gambling First Degree (Bookmaking)*[1]

The same racketeering act, racketeering act 1a, charges defendants with conducting an illegal gambling business in violation of the laws of the state of New York. Section 225.10, Subdivision 1, of the Penal Law of New York prohibits a person from promoting gambling in the first degree by knowingly advancing or profiting from such activity by engaging in bookmaking and receiving or accepting in any one day more than five bets totaling more than five thousand dollars.

According to section 225.00, a "person 'advances gambling activity' when, acting other than as a player, he engages in conduct which materially aids any form of gambling acitivity. Such conduct includes but is not limited to conduct directed toward the creation or establishment of the particular game ... toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to participate therein, toward the actual conduct of the playing phases thereof, toward the arrangement of any of its financial or recording phases, or toward any other phase of its operation. One advances gambling activity when, having substantial proprietary or other authoritative control over

premises being used with his knowledge for purposes of gambling activity, he permits such to occur or continue or makes no effort to prevent its occurrence or continuation."

The same section states that a "person 'profits from gambling activity' when, other than as a player, he accepts or receives money or other property pursuant to an agreement or understanding with any person whereby he participates or is to participate in the proceeds of gambling activity."

The evidence presented through Sullivan and recited above shows that the enterprise took in on any one day more than five bets totalling five thousand dollars. Sullivan's testimony—in regards to the bookmaking aspect of the business—that he personally took in on one day about two thousand dollars and that many other members of the operation were writing similar business, is sufficient to show that the requisite statutory monetary minimum has been satisfied. Testimony regarding defendants' association with the gambling business and their respective roles and duties within it is sufficient to show that the defendants knowingly agreed to promote gambling in the first degree through a bookmaking scheme.

The evidence discussed previously also shows that the defendants promoted gambling in the first degree in that they acted other than as players in advancing the illegal gambling activity, that they participated in activities toward the maintenance of gambling premises and gambling paraphernalia, that they participated in the conduct of the playing and financial phases of the gambling operation and that they jointly profited from the illegal gambling activity by sharing and distributing among themselves the proceeds of such gambling activity.

---

**1.** The indictment also charges violation of New York Penal Law § 225.05 (Promoting Gambling in the Second Degree) and § 225.15 (Possession of Gambling Records in the Second Degree). The court finds that the Government has introduced sufficient evidence to sustain its charges of Promoting Gambling in the First Degree and Possession of Gambling Records in the First Degree. The court therefore finds that the Government has similarly adduced evidence sufficient to sustain its charge of second degree violation of the New York gambling statutes by defendants.

*New York Penal Law § 225.10, Subdivision 2, Promoting Gambling First Degree (Policy)*

According to New York penal law, a person is guilty of promoting gambling in the first degree when he knowingly advances or profits from gambling by receiving, in connection with a policy or numbers scheme, (1) money or written records from a person other than a customer or player, or (2) more than $500 in any one day in such policy scheme. The Government has introduced sufficient evidence to show, or from which it could be reasonably inferred, that defendants received more than $500 in any one day from a numbers or policy scheme.

Sullivan testified—in regard to the policy or numbers aspect of defendants' gambling business—that while working for the gambling operation, he himself picked up bets totalling about $2000.00–$2500.00 on a given day. Sullivan's testimony and evidence recited in the previous sections show that defendants received more than $500.00 in any one day through their conduct and management of the gambling operation.

The court's observations in the preceeding section—concerning the advancement of and profiting from gambling activity by a person other than a player—applies equally to the violation of promoting gambling in the first degree as part of a policy scheme and are incorporated here.

*New York Penal Law § 225.20, Subdivision 1, Possession of Gambling Records First Degree, (Bookmaking)*

New York penal law provides that a person is guilty of possession—that is, of exercising dominion or control—of gambling records in the first degree when, with knowledge of the contents thereof, he possesses any writing, paper, instrument, or article of a kind commonly used in the operation of a bookmaking scheme, reflecting more than five bets totaling more than five thousand dollars.

As stated above, Sullivan testified that he wrote thousands of dollars worth of bookmaking bets a day and that the gambling operation employed numerous other workers who did similar work. Sullivan further stated that the defendants used 41 Highland Place as a facility where their gambling work was kept and computed at the end of the day. He also identified a book of gambling records seized from 41 Highland Place as being in defendant Gualtiere's handwriting. Sullivan's testimony, coupled with the testimony of Detective John Holder—who executed the search warrant for 41 Highland Place—and Detective John Cestare—who executed a search warrant at defendants' social club on 343 Saint Nicholas Street—both searches netting numerous records kept by the gambling business, is sufficient to show or to infer that the defendants knowingly possessed writing or paper commonly used in the operation of a bookmaking scheme, which writing represented more than five bets totalling more than $5000.00.

*New York Penal Law § 225.20, Subdivision 2, Possession of Gambling Records First Degree, (Policy Scheme)*

New York Penal Law provides that a person is guilty of possession—that is, of exercising dominion or control—of gambling records in the first degree when, with knowledge of the contents thereof, he possesses any writing, paper, instrument, or article of a kind commonly used in the operation of a policy scheme, and constituting more than five hundred plays or chances.

Evidence acquired by the government in its searches of places identified by Sullivan and law enforcement officials as defendants' gambling locations, and the testimony of Sergeant James Polthorak identifying records seized from 41 Highland Place and placed into evidence, demonstrate or allow a reasonable inferrence to be made, that defendants knowingly possessed such records representing more than five hundred plays or chances.

In sum, the court finds that the evidence recited in the preceding sections is sufficient to show that the defendants conducted, financed, managed, supervised, directd and owned an illegal gambling business in violation of 18 U.S.C. § 1955. Moreover, there is sufficient evidence to show that

defendants conducted the illegal gambling business as part of the ongoing criminal activities of the enterprise, that is, that defendants participated in the gambling operation to generate revenues for the enterprise and thus acted in furtherance of the enterprise's goals and objectives.

### 2. Racketeering Act #1b/Count 5: Transmission of Wagering Information

■ Racketeering Act 1b and Count 5 charges that defendants Maltese and Giovanelli, while engaged in the business of gambling, knowingly used and aided and abetted the use of a wire communication facility for the interstate transmission of bets and wagers in violation of 18 U.S.C. § 1084(a). In order to be found guilty of this offense, the Government must prove that a defendant was engaged in the business of betting and wagering as charged, that he used or aided and abetted the use of a wire communication facility to transmit bets or wagers in interstate commerce, and that he acted knowingly.

The only testimony relating to the taking of interstate bets over the telephone came from Keeran Sullivan. Sullivan testified that—while working for defendants' gambling operation—he took bets from callers in Chicago, Palm Springs, New Jersey, and Florida. He did this, however, despite express instructions from defendant Maltese not to take out-of-state bets because interstate gambling was more trouble. Sullivan did recall that sometime in the 1980s, Maltese told him to take a telephone bet on the Super Bowl from Maltese's brother, Anthony, who was living in Hollywood, Florida, at the time. Sullivan provided no testimony with respect to defendant Giovanelli's knowledge of or participation in the taking of these interstate bets.

As a matter of law, the court finds Sullivan's testimony to be insufficient to sustain the offense alleged in Racketeering Act 1b and Count 5 of the indictment. Sullivan's statement that Maltese specifically told him not to take interstate bets over the telephone casts serious doubt on the Government's contention that Maltese

knowingly aided and abetted Sullivan in the use of wire communication facility to take such interstate bets. Moreover, there is absolutely no evidence in the record that defendant Giovanelli knew about, authorized, or encouraged Sullivan to take interstate bets. The Government's theory is that Giovanelli must have known about and approved of the taking of interstate bets because he was the boss of the gambling operation and a "hands-on" manager who was aware of what his employees were doing. While such an inference may be permissible, it is nonetheless highly speculative and unsupported by any direct evidence of Giovanelli's knowing involvement in or authorization of Sullivan's taking of interstate bets.

Since the Government has introduced insufficient evidence to allow a jury to reasonably find Giovanelli and Maltese guilty beyond a reasonable doubt of the interstate transmission of bets and wagers in violation of 18 U.S.C. § 1084(a), each defendant's motion for a judgment of acquittal on Racketeering Act 1b and Count 5 is granted.

### 3. Racketeering Act 2/Count 4: Loan-sharking Conspiracy

■ The court finds that sufficient evidence has been introduced by the Government to show that the defendants Giovanelli and Maltese unlawfully and knowingly made extortionate extensions of credit in violation of 18 U.S.C. § 891 and § 892. As defined by the statute, "an extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person."

Sullivan testified that he personally collected shylock payments for Maltese from various individuals, for example, from "Philly Rocky", from "Joey", and from "Mario" for debts that those persons had incurred in defendants' gambling operation. Sullivan further testified that in con-

nection with the collection of shylock debts, he committed acts of violence at the behest of defendant Maltese.

Richard "Bud" Waters testified that, several times from the early 1970s until 1976, he borrowed money from Maltese, interest on which was to be repaid weekly at 3 cents on the dollar. According to Waters, he gave the interest payments on different occasions to Maltese at Maltese's fruit store on Knickerbocker Avenue. In addition, Waters testified that he had delivered some of the shylock payments to Giovanelli at Giovanelli's social club on 343 Saint Nicholas Avenue. Waters also stated that, in the late 1970s, Giovanelli came to his office and demanded payment of an outstanding $20,000.00 loan. When Waters told Giovanelli that he did not have the money because he had been hospitalized, Giovanelli tried to throw a punch at him.

Corroborating testimony concerning extortionate extensions of credit by defendants Giovanelli and Maltese was provided by Raymond Losito. Losito testified that, during his employment by the New York City Police Department, he worked undercover with the loansharking unit of the Special Operations Division. According to Losito, he was introduced to defendant Maltese in 1975–1976 by Stan Gramarot— Maltese's acquaintance and Losito's "partner"—who also had a horse betting operation with Maltese. Losito testified that he regularly borrowed money from Maltese in order to lend it out to others at an interest rate greater than the interest incurred on loans he had borrowed from Maltese, and that he regularly met with Maltese at the Knickerbocker Avenue fruit store to make such interest payments to Maltese. Losito further testified that he had approached Maltese with the proposition of starting a pinball business and that he had told Maltese that he needed $7500.00 to start this business. Maltese replied that he would go to "the Chin"—whom Cafaro testified became the head of the Genovese Crime Family—for the money. In light of the reference to the "Chin," which would suggest to the listener that there was an association between Maltese and the alleged high-ranking member of the Ge-

novese Crime Family, it could be inferred that there was an implicit understanding between the debtor and the creditor that delay in repayment or failure to repay could result in harm or violence to the debtor.

Losito also testified that he was introduced to Giovanelli at the London Squire restaurant after he, Losito, had informed Maltese that he needed to borrow money from Maltese at a lower interest rate. Losito stated that Maltese responded by saying that he would go to Giovanelli for the money. Losito then testified that at the meeting at the London Squire Restaurant, Giovanelli agreed to loan him $3000.00. Losito stated that he made interest payments on that loan at a rate of $60.00 per week, sometimes to Giovanelli and sometimes to Maltese or "Butch" (Keeran Sullivan). Maltese also informed Losito that he, Maltese, would make the payment to Giovanelli for Losito should Losito miss a payment, and that the amount could be later adjusted or worked out between Maltese and Losito through the horse business.

The Government has introduced sufficient evidence, through the testimony of Sullivan, Waters, and Losito, to show that defendants Giovanelli and Maltese unlawfully made extortionate extensions of credit in violation of 18 U.S.C. §§ 891 and 892. Moreover, the evidence is sufficient to show that Giovanelli and Maltese committed loansharking in furtherance of the activities of the criminal enterprise, i.e., that shylock loans were made to generate revenue for the enterprise and for the Genovese family, and that implicit or explicit threats of violence protected the moneylending activities of the enterprise by keeping its victims in fear and by identifying the enterprise with threats of violence and beatings.

4. *Racketeering Acts 3 and 4—Murder of Detective Anthony Venditti and Attempted Murder of Detective Kathleen Burke*

■ Racketeering Act 3 charges that defendants Giovanelli, Maltese, and Gualtiere

murdered and aided and abetted the murder of Detective Anthony Venditti on January 21, 1986. Racketeering Act 4 charges that the three defendants attempted to murder and aided and abetted the attempted murder of Venditti's partner, Detective Kathleen Burke, on that same day.

"A person is guilty of murder in the second degree [under New York law] when, with the intent to cause the death of another person, he causes the death of such person." New York Penal Law ("NYPL") § 125.25. A person is guilty of attempted murder under New York law when, acting with the intent to kill another person, "he engages in conduct which tends to effect the commission of such crime." NYPL § 110.00. A person aids and abets an act of murder or an attempted murder when that person " 'in some sort associate[s] himself with the venture ... participate[s] in it as in something that he wishes to bring about, [and] ... seek[s] by his action to make it succeed.' " *United States v. Tyler*, 758 F.2d 66, 70 (2d Cir. 1985) (quoting *United States v. DeFiore*, 720 F.2d 757, 764 (2d Cir.1988)).

Detective Kathleen Burke testified that she saw defendants Maltese and Gualtiere holding her partner, Detective Anthony Venditti, outside the Castillo Diner in Ridgewood, Queens, on the night of January 21, 1986. While Maltese and Gualtiere held Venditti, Giovanelli stood in front of Venditti and confronted him. As Burke went to assist Venditti, Giovanelli turned and fired a gun at her from point blank range. After she fell to the ground and returned fire, Giovanelli stood over her and fired a second shot which missed. Burke then saw Giovanelli turn in Venditti's direction and fire at him. At that moment, she also saw Maltese and Gualtiere firing at Venditti. Burke testified that she saw Venditti's body make a strange, jerking motion, and that she then blacked out. When she came to, the three defendants were gone and Venditti was lying motionless on the ground near her.

Medical testimony established that Venditti died of the gunshot wounds he received during the incident. Burke suffered a punctured lung and several broken bones as a result of one bullet wound to the left chest. Dr. Beverly Leffers, a medical examiner and an expert in forensic pathology, testified that bruises and scratch marks were found on Detective Venditti's upper left arm. This corroborates Detective Burke's account that Maltese and Gualtiere held Venditti during the attack, both preventing his escape and preventing him from assisting Burke. Though Venditti was armed, the evidence showed that he never drew or fired his weapon in self-defense.

Burke's testimony concerning defendants' participation in the shootings is corroborated by witnesses who were inside and near the Castillo Diner on the night and time of the attacks. Mercedes Pagan, an eyewitness inside the diner, testified that she looked out the window of the restaurant and saw Maltese firing a gun. Another eyewitness inside the diner, Thomas Kosior, also identified Maltese as being outside the diner at the moment of the shooting. Myra Rivera, who lived nearby the diner on Palmetto Street, testified that she heard shots and looked out her window. She saw a man walking quickly up Palmetto and watched him bend down behind a car across the street from her apartment. She recognized the man as Carmine Gualtiere, or "Baldy," as she knew him in the neighborhood. Police later found a handgun between a parked car and a curb on Palmetto Street. Testimony established that the handgun was one of three purchased in Florida by Anthony Martinelli at the request of Steven Maltese's brother, Anthony Maltese. Martinelli testified that Steven Maltese was present when Martinelli gave Anthony Maltese those guns.

In addition to the expert medical testimony and the testimony of the above eyewitnesses, John "Limpy" Cataraso—who stated that he had known and worked for defendants for many years—testified that he was walking down Palmetto Street at the time of the shooting when he heard noises that sounded to him like firecrackers. He then saw one man run past him, although he did not get a look at his face. A moment later, while turning a

corner, Cataraso testified that Giovanelli ran into him, knocked him into a wall and kept on running down Palmetto Street. Continuing to walk down the street, Cataraso was then approached by Maltese. Maltese gave him an object wrapped in a yellow cloth and told him to hide it in defendants' social club on 343 St. Nicholas Avenue. Cataraso did so, and later unwrapped the cloth, discovering a gun inside. This gun was never recovered by police.

Finally, Keeran Sullivan testified that, about an hour after the shooting, he accompanied Maltese and Vito Roselli to recover three more handguns that had been hidden under a car near the scene of the attack and—according to Cataraso and Rivera—in the escape path of defendants Giovanelli and Gualtiere. Sullivan testified that, after retrieving the weapons, the three men drove to a nearby street corner and dumped the guns into a sewer. Ten days later, Sullivan took police to the sewer where the three guns were located. The guns were recovered and expert testimony matched one of them to a bullet recovered from Detective Venditti's body.

Sullivan also testified to events suggesting that the motive for the attacks was to protect defendants' gambling operation from a perceived, though mistaken, threat of robbery by the two detectives. Sullivan stated that—after the robbery of one of defendants' gambling spots around November–December 1985—defendant Maltese became concerned about a brown Lincoln Continental automobile which he thought was following the employees of the gambling operation. Maltese gave Sullivan the license number of the car and told him that he believed the occupants of the brown Lincoln might be trying to rob the gambling operation. He told Sullivan to watch out for the automobile and to be careful. Sullivan testified that Maltese was nervous about the possibility of being robbed and began to carry a gun.

Sullivan's testimony about the brown Lincoln is corroborated by Detective Frank Cammarata, a relative of Maltese by marriage. Cammarata testified that, a few weeks before the Burke/Venditti shootings, Maltese asked him to identify the owners of an automobile with a license plate number that Maltese wrote down for Cammarata on a piece of paper. Cammarata refused, but kept the paper. In the hours following the shooting, after seeing the car at the 104th Precinct, Cammarata realized that the license number Maltese had given him matched the license plate of a brown Lincoln Town Car driven by Burke and Venditti. As Kathleen Burke testified, the two detectives had been using the car in an ongoing surveillance of defendants' gambling spots for the Joint Organized Crime Task Force.

5. *Racketeering Act 5/Count 6: Travel in Aid of the Racketeering Enterprise*

██ The indictment charges that as part of a pattern of racketeering activity, defendants Giovanelli and Maltese unlawfully and knowingly travelled in interstate commerce and used facilities in interstate commerce, and to aid and abet in such travel in and use of facilities in interstate commerce, with intent to (i) distribute the proceeds of unlawful activities, namely, gambling offense in New York; (ii) to commit crimes of violence to further such unlawful activities; and (iii) to promote, manage, establish, carry on, and facilitate such unlawful activities, in violation of 18 U.S.C. § 1952.

As against defendant Giovanelli, the court finds that the Government has failed to introduce sufficient evidence from which it could be reasonably inferred that Giovanelli knowingly traveled in interstate commerce or used facilities in interstate commerce—or aided and abetted in such travel and use—in violation of 18 U.S.C. § 1952.

Although Keeran Sullivan testified that he had taken interstate gambling bets while working for defendants' gambling operation, there is no evidence in the record to support the inferrence that defendant Giovanelli was aware that such interstate bets were taken or that they were taken at his behest.

With regard to the second and third prongs of the charge—that defendants

travelled in interstate commerce and used facilities in interstate commerce with the intent to commit crimes of violence and to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of such unlawful activities—Anthony Martinelli testified that he had purchased three guns on May 25, 1982 in Florida at the behest of Anthony Maltese, defendant Steven Maltese's brother, and that he had turned such guns over to Anthony Maltese at Anthony Maltese's service station, in Steven Maltese's presence, on the same day. One of the guns was later found in Queens, New York, on Palmetto Street, at the vicinity of the Burke/Venditti shootings. Martinelli also testified that he saw Giovanelli at Anthony Maltese's service station, not on May 25, 1982, but several months after that date. This testimony alone is insufficient to infer that Giovanelli either travelled in interstate commerce or aided and abetted in such travel to commit crimes of violence or to promote or facilitate such unlawful activities. The court therefore grants Giovanelli's motion for a judgment of acquittal on Racketeering Act 5 and Count 6 of the indictment.

■ As against defendant Maltese, however, the court finds that there is sufficient evidence to reasonably infer that he travelled in interstate commerce or used facilities in interstate commerce or aided and abetted in such travel and use, in violation of 18 U.S.C. § 1952. Sullivan testified that while working for defendants' gambling business, he took several bets from out-of-state callers despite express instructions from Maltese to the contrary. The court finds that Sullivan's testimony is insufficient to allow the inference that Maltese knowingly used and aided and abetted the use of interstate facilities for the commission of gambling offenses. However, the court finds that Anthony Martinelli's testimony concerning his purchase of three guns on May 25, 1982, in Florida where he turned such guns over to Anthony Maltese in the presence of Steven Maltese, is sufficient for the inferrence that Maltese knowingly violated 18 U.S.C. § 1952 as charged. Thus, defendant Steven Maltese was explicitly placed by Martinelli at Anthony Maltese's service station when the guns Martinelli bought were turned over to Anthony Maltese. In addition, their was received in evidence the receipt of purchase on which the serial numbers of the guns Martinelli had bought were recorded. The serial number on the gun found on Palmetto Street was matched by Martinelli to the serial number of one of the guns—as shown on the receipt—that he had bought for Anthony Maltese in 1982. Martinelli's testimony and the copy of the receipt of purchase placed in evidence, coupled with Sullivan's testimony about the structure of the enterprise and defendant Maltese's role in such enterprise, provide sufficient evidence to show that defendant Maltese travelled and aided and abetted in the travel in interstate commerce to commit crimes of violence and to further the unlawful activities of the enterprise in violation of 18 U.S.C. § 1952. Defendant Maltese's motion for a judgment of acquittal on Racketeering Act 5 and Count 6 of the indictment is denied.

### 6. Racketeering Act 6: The Murder of Charles Bentivegna

■ Racketeering Act 6 charges that defendants Giovanelli and Maltese murdered and aided and abetted the murder of Charles Bentivegna on May 14, 1976. The law of New York state with respect to murder and aiding and abetting murder has already been discussed in connection with Racketeering Acts 3 and 4.

Keeran Sullivan testified that early in the 1970s, Charles Bentivegna worked for defendants' gambling operation as a "runner." He also stated that Bentivegna was commonly referred to as "Kid Charlie" or "Fat Charlie." According to Sullivan, Maltese ultimately fired Bentivegna from the gambling operation and beat him with a pipe in the back of Maltese's fruit stand. Sullivan testified that he personally witnessed this assault.

Sullivan testified that, in 1974, he and the other members of defendants' gambling operation learned that Bentivegna had become an informer and was cooperating

with authorities in the investigation of their gambling business. Sullivan testified that he found out about Bentivegna's defection when Maltese told him (Sullivan)—after Maltese discussed the matter with an attorney—that Bentivegna was a "rat." Sullivan also recalled conversations among Giovanelli, Maltese, and their associates, in which Bentivegna was referred to as a "rat" and in which they told each other to expect trouble. According to witness Michael Hammermand, a former assistant district attorney in King's County, Bentivegna's cooperation did, in fact, lead to the arrest of all three defendants and many of their associates on gambling charges in the fall of 1974.

Witnesses at the scene of the Bentivegna shooting testified that it was carried out by two men who ambushed Bentivegna as he sat in a car on Norman Street in the Ridgewood section of Queens. After Bentivegna was shot, the two men fled in a car. Medical testimony and testimony from police officer John Donovan put Bentivegna's death at on or after 9:00 p.m. on the evening of May 14, 1976. Doctor John Pearl testified that Bentivegna died from multiple gunshot wounds to the face and neck.

Keeran Sullivan testified that on the night and approximate time of the shooting, he was waiting in a parked car with the motor running about a block away from the scene of the attack. Sullivan stated that Maltese had shown him this spot previously and had instructed him to wait there on the night in question. Sullivan testified that, after waiting for a time, a car pulled up to his, and Maltese and Giovanelli got out and transferred to Sullivan's auto. As Sullivan drove away, he noticed that Maltese and Giovanelli were changing clothes in the back of the car. Sullivan dropped Giovanelli off and accompanied Maltese to a bar. Sullivan testified that Maltese was visibly upset and at one point stated: "That fucking kid made me kill him."

The next day, on May 15th, Sullivan went to defendants' social club and learned from a newspaper that Bentivegna had been shot and killed the night before. Sullivan testified that all the members of the club expressed satisfaction that Bentivegna was dead because Bentivegna was a "rat." Thus, if Bentivegna was murdered by Giovanelli and Maltese, the evidence suggests that the killing was committed in furtherance of defendants' criminal enterprise since its purpose was to protect and defend the activities of the enterprise from exposure to lawful authorities.

Relationship Plus Continuity

■ Having set out the evidence with respect to each individual racketeering act charged in the indictment, evidence of a *pattern* of racketeering activity is shown by the fact that at least two of the racketeering acts allegedly committed by each defendant were related by common participants, victims, methods, goals, or motive. *United States v. Indelicato, supra,* 865 F.2d at 1382. With respect to the threat of continued racketeering activity—the second requirement of a pattern—the existence of such a threat is demonstrated by evidence that each defendant committed the alleged racketeering acts in furtherance of a criminal enterprise whose business was racketeering activity. *Id.* at 1383–84. Since at least two of the racketeering acts allegedly committed by each defendant demonstrate relatedness plus a threat of continued racketeering activity, these acts constitute a "pattern" within the meaning of the RICO statute. *Id.* at 1383.

d. Participation in the Enterprise through a Pattern of Racketeering Activity

■ The fifth and final element of a RICO offense is that a defendant conducted or participated in the conduct of the enterprise's affairs through the pattern of racketeering activity previously discussed.

The facts recited above are sufficient to show that each defendant engaged in a pattern of racketeering activity in conscious association with and in deliberate furtherance of the affairs of the enterprise—whether to generate revenue for its members or to protect and defend the activities of the enterprise through threats and violence. Since the evidence shows that each defendant's employment by or associ-

ation with the enterprise facilitated or influenced his commission of the racketeering acts, and since those racketeering acts were intended to have and did have some impact or effect on the enterprise, the Government has satisfactorily demonstrated—as the RICO statute requires—that each defendant conducted and participated in the affairs of the racketeering enterprise through a pattern of racketeering activity.

e. Participation in the Affairs of the Enterprise through the Collection of Unlawful Debt

■ In addition to alleging that the defendants participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, Count 2 of the indictment also charges that the defendants unlawfully and knowingly conducted and participated in the affairs of the enterprise through the collection of unlawful debt, as defined in 18 U.S.C. § 1961(6). This section describes unlawful debt as a debt "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws against usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."

The first three elements of this offense—existence of the enterprise, effect of the enterprise's activities on interstate commerce, and defendants' association with and employment by the enterprise—have already been discussed and are incorporated here.

As set forth in this indictment, the fourth element of participation in the affairs of a criminal enterprise through the collection of unlawful debt is that the defendants did unlawfully and knowingly collect, or aid and abet the collection of, unlawful debts incurred in gambling activity in violation of the laws of the state of New York. The evidence discussed above as to defendants' conduct of an illegal gambling business in violation of the New York state law applies equally to the definition of "unlawful debt" and is incorporated here. The court now turns to the three specific instances of collection of unlawful debt alleged in the indictment.

*Unlawful Debt Collection # 1: John Marsala*

The indictment charges that as part of defendants' gambling business, defendants collected and aided and abetted the collection of unlawful debts from John Marsala, from whom defendants accepted weekly policy, sports, and horses wagers totalling as much as $500.00 per week.

Keeran Sullivan testified that while working for defendants' gambling operation, he frequently took Marsala's policy, horses, and sports bets over the phone and in person under the code name of "Green." According to Sullivan, he turned the policy and horses bets he had written over to Gualtiere, while the sports bet records went to Joe Rizzo and Steven Maltese.

Sullivan also testified that Giovanelli was the "banker" of the gambling operation, that Maltese was the "underboss," and that Gualtiere was the main controller. He further stated that the three defendants each received percentages of money taken in from the various aspects of the gambling operation. Sullivan's testimony as to the general structure of the gambling business and defendants' respective roles and stakes in such business and his testimony as to the handling of the "Green" account is sufficient to demonstrate that the defendants unlawfully and knowingly collected and aided and abetted the collection of Marsala's unlawful debt and, by doing so, participated in the affairs of a criminal enterprise through the collection of that unlawful debt.

*Unlawful Debt Collection # 2: Barbara Messina Kranz*

The indictment charges that defendants collected and aided and abetted in the collection of unlawful debts from Barbara Messina Kranz, which debts were incurred

when defendants accepted policy or numbers wagers totalling between $200.00—$400.00 per week from Kranz as part of defendants' gambling operation.

Keeran Sullivan testified that he took numbers bets over the phone from Barbara Messina Kranz under the code name of "Cement 2." Kranz herself testified that she began placing bets under the same code name of "Cement" (and later, under the code name of "Thirty–Eight") with defendants' gambling business seven or eight years ago while working at her father's bakery shop. She also testified that she regularly gave money to a man with a bad complexion and a scraggly appearance who frequently came by the bakery shop to collect payments. According to Kranz, she placed daily bets for herself and for others. She stated that her own personal bets amounted to $25.00 a day, but that if the bets of others placed by her were also included, the total would amount to between $400.00—$500.00 a week.

The testimony of Keeran Sullivan and Barbara Messina Kranz testimony about the "Cement 2" account, coupled with Sullivan's testimony about the structure of the gambling operation and defendants' association with and stakes in such business, is sufficient to demonstrate that defendants collected and aided and abetted the collection of unlawful debts from Barbara Messina Kranz and, by doing so, participated in the conduct of a criminal enterprise through the collection of that unlawful debt.

*Unlawful Debt Collection #3: Larry Alfano*

The indictment charges that defendants collected and aided and abetted the collection of unlawful debts from Larry Alfano, which debts were incurred in gambling activities contracted through the placement of policy, sports, and horses wagers with defendants' gambling operation. The indictment also charges that the defendants collected and aided and abetted the collection of such unlawful debts from Alfano on a weekly basis.

Keeran Sullivan testified that he took steady weekly bets from Larry Alfano under the code name "Cross." Sullivan also testified that the "Cross" account was part of another account code named "Star" which was held by defendant Maltese. According to Sullivan, he turned over the numbers bets he had accepted from Alfano to defendant Gualtiere, and the horse and sports bets to defendant Maltese and to Joe Rizzo. Sullivan's testimony concerning the handling of the "Cross" account, coupled with his testimony concerning the structure of the gambling business and the association and stakes of defendants in that business, is sufficient to demonstrate that defendants collected and aided and abetted the collection of unlawful debts from Alfano and, by doing so, participated in the conduct of a criminal enterprise by collection of that unlawful debt.

### III. CONSPIRACY TO DEFRAUD THE UNITED STATES

■ Count 7 charges that the defendants—along with their associates in the gambling operation—conspired to defraud the United States by "impeding, obstructing, and defeating the lawful functions of the Internal Revenue Service ... in the ascertainment, computation, assessment and collection of the revenue ..." 18 U.S.C. § 371. Specifically, the indictment alleges that defendants failed to declare on their personal income taxes revenues paid to them and generated by their illegal gambling business and failed to keep proper records reflecting the income generated by that business and payments made to the business' employees. The overt acts alleged in furtherance of this conspiracy are that Giovanelli filed a tax return for 1983, Maltese did not file a tax return for 1985, and Gualtiere filed a tax return for 1984.

It is well-settled that an agreement to impede and obstruct the Internal Revenue Service in the ascertainment and collection of income taxes states a conspiracy to defraud the United States under 18 U.S.C. § 371. *United States v. Klein*, 247 F.2d 908 (2d Cir.1957), *cert. denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958); *see United States v. Mollica*, 849 F.2d 723 (2d Cir.1988); *United States v. Rosengarten*,

857 F.2d 76 (2d Cir.1988), *cert. denied,* 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). In order to prevail on this charge at trial, the Government must show that the defendants implicitly or explicitly agreed that they would not keep proper records with respect to the income generated by their illegal gambling business and payments made to the business' employees, and that they would not declare on their personal income tax returns monies they themselves made through that gambling business. *See United States v. Shermetaro,* 625 F.2d 104, 109 (6th Cir.1980) (citing *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943)) (if tax evasion motive plays any part in an illegal scheme, offense of conspiring to defraud the United States can be made out even though the scheme may have other purposes such as the concealment of crimes).

Keeran Sullivan testified that, during the entire time he worked for defendants' gambling business, the business' employees were paid in cash and no income taxes were ever witheld from their earnings. Sullivan stated that, to his knowledge, none of the defendants or any of the other employees of the gambling operation ever paid income taxes on any of the money they made through the illegal gambling business. Sullivan also testified that gambling winners were paid in cash and that no taxes were ever taken out of those winnings. Finally, Sullivan stated that records of bets placed with defendants' gambling business were routinely backdated in an attempt to fool the police into thinking they reflected old gambling work.

Finally, Sullivan testified that the gambling operation used the lawful betting offices of Off–Track Betting (OTB) to hedge against bookmaking losses caused by customers of defendants' gambling operation who would bet on and win the "Daily Double." Since OTB paid off on the Daily Double at a higher rate than defendants paid to their own winning customers, Sullivan testified that money bet with defendants on the Daily Double would be rebet by them at OTB. If they won the bet, Sullivan stated that the gambling business would send senior citizens to OTB offices to collect the money. According to Sullivan, this was done because successful bettors had to give their social security numbers to OTB to collect their winnings and senior citizens were not taxed on any money they won.

Additional proof that defendants sought to conceal the revenue generated by their gambling business is shown by testimony that FBI agents recovered over $400,000 in cash from bank safe deposit boxes maintained by defendant Giovanelli. The seizures also corroborate Sullivans's testimony that Giovanelli was the "boss" and "banker" of defendants' gambling business.

Finally, as to the overt acts alleged in furtherance of the conspiracy, Internal Revenue Service employer Christine Berner provided agency records showing that Giovanelli filed a personal income tax return for 1983, Maltese did not file one for 1985, and Gualtiere filed one for 1984. Given the testimony concerning the substantial revenues generated by the gambling business and defendant's respective stakes in such business, a jury could reasonably conclude that—by filing or failing to file the above noted tax returns—defendants tacitly or explicitly agreed to obstruct and impede the lawful functions of the Internal Revenue Service by failing to report large amounts of personal income generated by their illegal gambling business.

## IV. CONCLUSION

On the basis of the evidence presented by the Government in its direct case and recited in this opinion, the court finds that defendants Giovanelli, Maltese, and Gualtiere knowingly and wilfully became a member of and participated in the RICO conspiracy charged in Count 1 of the indictment and the conspiracy to defraud the United States charged in Count 7. In addition, there is sufficient evidence to show that defendants Giovanelli and Maltese knowingly and wilfully became a member of and participated in the loansharking conspiracy charged in Racketeering Act 2 and

Count 4. Accordingly, pursuant to *United States v. Geaney, supra,* co-conspirator declarations may be considered by the jury against each defendant with respect to the conspiracies charged.

As to defendants' motions for a judgment of acquittal on all counts pursuant to Fed.R.Crim.Pro. 29, the evidence presented by the Government in its direct case and recited in this opinion is sufficient to withstand those motions, except, the motion of defendants Giovanelli and Maltese to dismiss Racketeering Act 1a and Count 5 (transmission of gambling information) is granted, and the motion of defendant Giovanelli to dismiss Racketeering Act 5 and Count 6 (travel in aid of racketeering) is granted.

---

Benito Romano, U.S. Atty., S.D.N.Y. by Adam S. Hoffinger, J. Gilmore Childers, Asst. U.S. Attys., New York City, for U.S.

Lawrence Hochheiser, Hochheiser & Aronson by Vivian Shevitz, Georgia J. Hinde, New York City, for defendant Federico Giovanelli.

Ira S. Cooper, Zerin & Cooper by Ira S. Cooper, Neil Rothfeld, New York City, for defendant Steven Maltese.

Robert M. Baum, The Legal Aid Soc., Federal Defenders Services Unit by Roland Thau, Robert E. Precht, New York City, for defendant Carmine Gualtiere.